UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Juan Marcette Davis,<br>　　　　　　　　　　　Plaintiff,<br>v.<br>R. Walker, Chief Physician and Surgeon; G. Casian, Primary Care Physician; Sergeant Flores; C. Clark, Correctional Officer; and Does 1-10,<br>　　　　　　　　　　　Defendants. | 14cv1297 BAS (NLS)<br><br>**REPORT AND RECOMMENDATION FOR ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[Dkt. No. 32]** |

### I.   Introduction and Procedural Background.

Plaintiff Juan Marcette Davis, a prisoner formerly incarcerated in the California state prison system, is proceeding *in forma pauperis* in this civil rights action filed under 42 U.S.C. § 1983. He alleges that while housed at RJ Donovan State Prison (Donovan), Defendants were deliberately indifferent to his serious medical needs stemming from a painful callous on the in-step of his left foot that required repeated treatment. Davis alleges eighth amendment claims due to Defendants' alleged failure to appropriately treat the callous and accommodate him in a lower bunk on the lower tier of the prison, which caused Davis to suffer further serious injuries.

The court screened the complaint and directed the clerk to issue summons for defendants Walker, Casian, Flores and Clark. The Marshal served the complaint on Walker, Casian and Flores. The summons as to Clark was returned unexecuted because per the litigation coordinator at Donovan, there was no Correctional Officer Clark employed there. Dkt. No. 10.

Before the court is a Motion for Summary Judgment filed on behalf of appearing defendants Casian, Flores and Walker. Defendants, and the court, notified Davis of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998 (en banc)).[1] After the court issued the notice, Davis—with defense counsel's consent—filed motions to continue the summary judgment hearing date, reopen discovery and continue pretrial dates for two months, because Davis had procured counsel. The court granted the motions. Davis, after having had counsel conduct follow-up discovery, filed an opposition to the summary judgment motion. Defendants filed a reply.

For the following reasons, the court **RECOMMENDS** that the district judge **GRANT in part** and **DENY in part** Defendants' motion for summary judgment.

**II.      Factual Background.**

Davis transferred to Donovan from Wasco State Prison on March 24, 2010. Compl., p.12.[2] At that time he had a "chrono" ordering that he be placed in a lower bunk due to the presence of a callous on the bottom of his left foot.[3] *Id.* The callous had

---

[1] *Klingele* and *Rand* require the district court to ensure that a pro se prisoner has been given "fair notice ... of the requirements and consequences of a summary judgment motion." *County of Los Angeles v. Beltran*, 514 F.3d 946, 952 (9th Cir. 2008).

[2] Unless otherwise noted, the page numbers reference the CM/ECF filing page numbers.

[3] A "chrono" notes an accommodation made for a medical condition for an inmate. Walker Decl. ¶ 6. They are classified as "temporary" or "permanent." *Id.* A "temporary" chrono has a specific end-date upon which the accommodation automatically terminates (*e.g.*, accommodation in a lower bunk for 90 days). *Id.* A "permanent" chrono has no specific designated end date but can terminate at any time,

developed after removal of a plantar mass on the arch his left foot in 2005, when he was at Wasco. Davis Decl. ¶ 2; Walker Decl. Ex. B, p.10. It measured half a centimeter by two centimeters. Casian Decl. ¶ 4. The pain from this condition varied based on the size of the callous, the degree to which it was protruding, and the amount of pressure on his left foot. Davis Decl. ¶ 2.

When he arrived at Donovan in March 2010, Davis says that the prison honored his existing chrono and placed him in a lower bunk on the lower tier. Davis Decl. ¶ 3. He had appointments with Dr. Campbell, his primary care physician with the California Department of Corrections and Rehabilitation (CDCR), several times over the next 16 months, who cared for his foot and referred him to a podiatrist when his condition did not improve. *Id.* at ¶ 4. On August 29, 2011 Dr. Campbell noted that Davis still had not seen a podiatrist, and sent a second request for one. Frieder Decl. Ex. C, p.2. She also noted that there was a podiatry backlog due to the "recent loss of contract." *Id.*

Dr. Wagers, a contract podiatrist, saw Davis on September 1 and 22, 2011. Walker Decl. Ex. B, Dkt. No. 32-5, pp.11-13. He noted that Davis had a "chronic foot problem [that would last] most likely the rest of the patient's life." *Id.* Dr. Wagers performed "debridement" (removal of tissue) surgery on the callous, ordered orthopedic shoes, and recommended a "permanent lower bunk, lower tier [chrono] – not too [*sic*] change." *Id.* at 13. Dr. Campbell examined Davis again on October 6, 2011 and reviewed the request for a permanent lower bunk chrono. *Id.* at 11, 14-15. She granted the request and issued the "permanent" chrono the same day. *Id.* at 11. The chrono itself states that "[c]hronos indicating permanent accommodations shall be reviewed annually." *Id.* at 11.

In the complaint, Davis alleges that he did not receive any *treatment* for his callous for over 18 months, from the time of his last podiatrist appointment in fall 2011 until he left Donovan on April 18, 2013. Compl., p.13. Also, his orthopedic shoes were taken

---

based on a medical review. *Id.* As Dr. Walker of the CDCR explains, "an inmate will never receive a 'permanent' chrono that can never be reviewed or changed." *Id.*

from him in a random, prison-wide raid, and never replaced. Davis Decl. ¶ 8. Meanwhile, Defendants say that Davis' foot problem was treated because he had "twenty medical visits for his foot between September 1, 2011 and April 15, 2013." Mem. Ps&As, p.5 (citing Walker Decl. Ex. B). In sum, the parties disagree as to whether nurse evaluations for eligibility of medical services for the specific foot problem amount to treatment of that problem.[4] A review of the exhibit reveals these details:

- October 6, 2011: Comprehensive Accommodation Chrono written by Dr. Campbell permanently placing Davis in a bottom bunk. This was based on two visits (September 1 and 22, 2011) with Dr. Wagers, a podiatrist, who diagnosed Davis with a chronic foot problem that would likely last the rest of his life, as well as an October 6, 2011 visit with Dr. Campbell (Dkt. No. 32-5, pp.11-15).

- October 13, 2011: Follow-up visit with podiatrist Dr. Wagers (*Id.* at 16). [In his declaration Davis says that this appointment never occurred.]

- January 12, 2012: Davis saw a nurse practitioner regarding other ailments, no mention of the callous (*Id.* at 17).

- January 25, 2012: Medical visit with RN Oliveros concerning blood tests for other ailments, no mention of the callous (*Id.* at 18).

- February 20, 2012: Dr. Campbell requested replacement of Davis' orthopedic shoes as well podiatry services for him. Dr. Choo denied both requests on February 23, 2012 (*Id.* at 19-20).

- June 13, 2012: Medical visit with Dr. Campbell, where she noted that (1) Davis was last seen on March 16, 2012; (2) the foot pain was likely to be a chronic condition; (3) she recommended a lower bunk; and (4) and noted an accommodation chrono issued on October 6, 2011 (*Id.* at 21-23).

- August 2012: Medical Classification Chrono saying that Davis' chrono would be reviewed in October 2012 (*Id.* at 10).

---

[4] Davis does not complain about the treatment he received by Dr. Campbell, his CDCR primary care physician until June 2012, after which Dr. Casian took over.

- August 31, 2012: Davis filled out a Health Care Services Request Form to ask that his lower bunk accommodation be "updated." Nurse Perez saw Davis on September 11, 2012 and set doctor appointment for September 14, 2012. (*Id.* at 24).

- September 17, 2012: Davis filled out a Reasonable Modification or Accommodation Request, asking for a mobility impaired vest, orthopedic shoes and that his chrono be placed in the computer for medical staff and officers because his chrono was not "logged in the computer." Frieder Decl., Ex. A, p.14.

- September 25, 2012: Davis filled out a Health Care Services Request Form to ask to see a podiatrist. On September 27, 2012 RN Gines evaluated him. (Dkt. No. 32-5, p.25).

- October 3 and 4, 2012: Medical visits with nurses regarding foot pain, acne, and request that bottom bunk accommodation be renewed. The requests were denied. (*Id.* at 26-28).

- October 15, 2012: Davis filled out a Health Care Services Request Form asking for pain relief for his foot. On October 17, 2012 RN Vazquez noted that Davis was seen on October 4 and 10, 2012 and that he did not meet criteria for a lower bunk chrono and was encouraged to buy new tennis shoes through the inmate catalog. (*Id.* at 29-32).

- October 29, 2012: Davis filed a 602 Health Care Appeal based on the medical staff's denials for (1) a low bunk/low tier chrono renewal; and (2) a referral to podiatry. Walker Decl. Ex. A.

- November 7, 2012: Davis filled out a Health Care Services Request Form to ask to see a podiatrist. On November 9, 2012 Davis refused to see a nurse as an alternative to a podiatrist. (*Id.* at 33-34).

- November 19, 2012: In response to the 602 appeal filed on October 29, 2012, Davis had an evaluation with Dr. Casian for foot pain where Dr. Casian found no medical necessity for a lower bunk chrono (*Id.* at 35-36).

- January 21, 2013: Davis saw the on-call doctor after he fell from an upper bunk and injured his back; he was given a lower bunk chrono for three months (*Id.* at 37-40, Dkt. No. 32-6, p.1).

- January 24, 2013: Davis was evaluated for his back pain, and noted that he had not seen a podiatrist since September 22, 2011 (Dkt. No. 32-6, pp.2-5).

- January 25, 2013: Davis' foot was examined and he was advised to resubmit a Health Services Request Form if his persistent foot pain did not resolve in 14 days (*Id.* at 6).

- February 1, 2013: Davis had a follow up visit for his back injury (*Id.* at 7-9).

- February 8, 2013: Davis was evaluated by a Nurse Practitioner Velardi for his continued back pain (*Id.* at 10-11).

- February 13, 2013: Davis examined by RN Steadman for back pain, who refused his request for stronger pain medication (*Id.* at 12-15).

- February 25 and March 5, 11, 18 and 28, 2013: Davis examined by different nurses for back and foot pain (*Id.* at 16-28).

- April 3, 2013: Dr. Chau examined Davis' foot, and referred him to a podiatrist (*Id.* at 29-32).

- April 11, 2013: A nurse examined Davis for his back pain (*Id.* at 33-36).

- April 12, 2013: Dr. Seeley approved Dr. Chau's request for a podiatrist appointment for Davis, and one was set for June 25, 2013 (*Id.* at 37).

- April 15, 2013: Dr. Casian examined Davis for his foot and other ailments, where she noted he had a pending referral to podiatry for June 2013 (*Id.* at 38-40). She also wrote a Comprehensive Accommodation Chrono placing Davis temporarily in a bottom bunk for three months (Dkt. No. 32-5, p.9).

In sum, these visits show that Davis was seen by general practice doctors, nurse practitioners, registered nurses or nurses more than 20 times from October 6, 2011 to April 15, 2013. Davis received medical accommodations that included orthotic insoles, a cane, and a temporary lower bunk bed assignment after he injured his back. But Davis did not receive any consultations with a podiatrist, any debridement surgeries, or any orthopedic shoes during this time. Starting in September 2012, Davis' repeated requests for a lower bunk, lower tier chrono renewal based on his foot injury were all denied.

Specifically, starting with RN Gines on September 27, 2012, and continuing with NP Denbela on October 3, NP Velardi on October 4, Nurse Perez on October 11, and RN Vasquez on October 17, 2012, all the nurses told Davis that he did not meet the criteria for a lower bunk chrono based on his foot problem.  On November 9, 2012, Davis refused to see a nurse as an alternative to a podiatrist.  Dr. Casian then examined Davis on November 19, where she noted there was no medical necessity for a lower bunk chrono or for referral to a podiatrist.

During these visits Davis told the medical staff that he was in severe pain and his condition made it difficult for him to jump up to, and down from, a top bunk, and that he experienced pain while standing and working.  Davis Decl. ¶ 10.  He also told them that orthopedic shoes and debridement surgeries helped his condition, and that a lower bunk was necessary to control his pain and prevent further injury. *Id.*

On December 10, 2012, Davis alleges that defendant Flores saw Davis' permanent chrono on the computer, yet stripped him of the lower bunk, stating that there were no more lower bunks for him to have.  Compl., p.2; Davis Decl. ¶ 15.  Flores says that on December 10 an inmate with a valid medical chrono needed a lower bunk but none were available.  Flores Decl. ¶ 4.  So Flores asked Davis if he had a valid medical chrono.  *Id.* Davis did not have a paper copy of the chrono, so Flores checked the computer.  *Id.* Flores said that there was no valid medical chrono or other accommodation for Davis noted on the computer, so he moved Davis to an upper bunk.  *Id.*

Davis was then forced to use the sink to climb up onto, and down from, the top bunk.  Davis Decl. ¶¶ 15, 16.  This climbing action required Davis to use the sensitive part of his foot to step onto the sink, or a desk, to get up and down from the top bunk. Davis Decl. ¶ 17.

On January 21, 2013, while trying to descend from the upper bunk, Davis slipped off the sink in his cell and fell to the floor, injuring his back.  Compl., p.10; Davis Decl. ¶ 17.  Davis says his pain was so severe that he could not attend mental health depression groups and that he needs other inmates help to go to the "chow hall, laundry, [and]

downstairs." Compl. pp.8, 10.

Davis left Donovan on April 18, 2013. Compl. p.13; Davis Decl. ¶ 2. Once he transferred out of Donovan into a different penal institution, Davis saw a podiatrist and received orthopedic shoes and a permanent lower bunk, lower tier chrono. Davis Decl. ¶¶ 20-21. He received debridement surgeries approximately once every three months and physical therapy for his back twice a week, for the duration of his incarceration. *Id.*

Davis points out that on March 18, 2013, court medical experts issued a report in a different federal case that found that Donovan had inadequate health care facilities and "serious problems related to access, timeliness, and quality of care." Frieder Decl. Ex. F.

Finally, Dr. Walker never personally examined or treated Davis. Walker Decl. ¶ 2. He only reviewed two inmate appeals that Davis filed regarding his medical treatment. Walker Decl. Ex. A.

### III. Legal Standards.

#### A. Summary Judgment.

Summary judgment is appropriate when there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" when it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party can establish an absence of a genuine issue of material fact by (1) presenting evidence that negates an essential element of the non-moving party's case; or (2) demonstrating that the nonmoving party failed to establish an essential element of that party's case. *Celotex*, 477 U.S. at 322-323. The moving party must identify the pleadings, depositions, affidavits or other evidence that the party "believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323.

If the moving party meets this burden, the non-moving party must do more than demonstrate a mere "metaphysical doubt as to the material facts." *Scott v. Harris*, 550

U.S.372, 380 (2007) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  It must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must view the underlying facts in the light most favorable to the party opposing the motion.  *See Matsushita*, 475 U.S. at 587.

### B. Section 1983.

"[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Graham v. Connor,* 490 U.S. 386, 393-394 (1989) (citation omitted).  To prevail on a section 1983 claim, a claimant must prove that: (1) a person acting under color of state law committed the conduct at issue; and (2) the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States. 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc).

Defendants do not dispute that they were acting under color of state law.  Rather, they argue that there are no triable issues of fact as to whether they violated any of Davis' rights protected by the Constitution.

### IV.  Eighth Amendment Deliberate Indifference Claim.

The eighth amendment protects prisoners from "inhumane conditions of confinement."  *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Consequently, the government must "provide medical care for those whom it is punishing by incarceration," and cannot act with deliberate indifference to a prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A prison official acts with deliberate indifference if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Deliberate indifference

is also known as the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104 (internal quotations omitted).

To prevail, a plaintiff must make (1) an objective showing that he had a serious medical need; and (2) a subjective showing that the specific defendants were deliberately indifferent to that need. *Id.*; *Farmer*, 511 U.S. at 837; *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).

### A. Objective Standard: Davis' Serious Medical Need.

A medical need is serious if it "result[s] in pain and suffering." *Estelle*, 429 U.S. at 103. The "suffering" test under *Estelle* can be met where an inmate suffers injuries caused by falling. *Colwell*, 763 F.3d at 1067. A serious medical need can also exist where "failure to treat the injury or condition 'could result in further significant injury[.]'" *Id.* at 1066 (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.2006). Other indications include "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Colwell*, 763 F.3d at 1067 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir.1992)).

Here, Davis had a recurring, protruding callous that caused him problems since 2005. He received a lower tier, lower bunk medical accommodation for that callous while incarcerated at Wasco, for one of his years at Donovan, and for the rest of his incarceration after he transferred out of Donovan. For the approximate 18 months in question in this case, Davis had repeated medical visits where he almost always complained of foot pain and asked for treatment and relief for the callous. A podiatrist at Donovan diagnosed him with a chronic foot condition likely to last the rest of his life. Davis says that in his appeal he told Defendants that he felt unsafe climbing to the top bunk, worried about falling, and was in constant pain. Davis Decl. ¶ 16. Davis in fact fell while trying to descend from the top bunk, injuring his back.

Considering that at least two doctors at Donovan and doctors at other CDCR

institutions found Davis' foot injury worthy of comment and treatment, his foot pain affected his ability to get in and out of an upper bunk bed, and he suffered from chronic foot pain as documented in the medical records, the court finds that Davis satisfied the objective standard and demonstrated a serious medical need based on the recurring, protruding callous on his foot.

### B. Subjective Showing: Defendants' Deliberate Indifference.

#### 1. Dr. Casian

Dr. Casian first examined Davis on November 19, 2012, approximately two and half months after Davis first requested a renewal of his chrono. She examined him in response to a 602 appeal form that Davis filed for failure to renew his lower bunk chrono or to refer him to a podiatrist. Those chrono and podiatry requests were denied by several different nurses.

Dr. Casian said that before the November 19 exam, she reviewed Davis' medical file from Donovan from 2011 to the time of the exam. Frieder Decl., Ex. E, Casian Depo 23:8-18. While she did not review the records from the podiatrist, Dr. Wagers, she "knew he had chronic foot pain" and "knew he was evaluated by podiatry." Casian Depo 24:8-25:8. In her treatment notes from that day, Dr. Casian said that Davis complained of "intermittent foot pain with prolonged walking and standing." Walker Decl., Ex. B, Dkt. No. 32-5, pp.35-36. She also noted that it was moderately tender. *Id.* After her exam Dr. Casian denied Davis' request to renew his chrono and to see a podiatrist. *Id.* In coming to that decision, Dr. Casian did not consult a podiatrist, and based her decision solely on her assessment and apparent incomplete review of Davis' medical record. Casian Depo 49:8-16.

Dr. Casian's treatment notes as to "intermittent pain" contrast with what Davis noted on his health care services request forms that formed the basis of his 602, as well as with some of the examining nurses' notes:

/ / /

/ / /

- September 25, 2012: "I have pain in the sole of foot from prior surgery." On September 27 RN Gines noted that on a 1-10 pain scale Davis had a "9" for pain on the sole of his foot. (Walker Decl. Ex. B, Dkt. No. 32-5, p.25).

- October 3, 2012: "I cannot climb up and jump down from upper bunk." (*Id.* at 26).

- October 3, 2012: "I spoke with Dr. [*sic*] Denbela who have [*sic*] no knowledge of my foot surgery and my chrono….The doctor's assessment is no[t] accurate with my medical problem." (*Id.* at 28).

- October 15, 2012: "I had surgery while at Wasco State Prison. My foot is in pain. I'm in need of some kind of pain relief." (*Id.* at 29).

- October 17, 2012: RN Vasquez noted that Davis was in "extreme pain" and said that Davis explained that a "podiatrist used to file down calloused area of foot and [he] wants to see podiatry." (*Id.* at 32).

- November 7, 2012: "I have a need to see podiatry. (A.S.A.P.). I've been having this foot pain for 5 to 6 years of my incarceration and I still have pain in my left foot daily." (*Id.* at 29).

Admittedly, Dr. Casian did not review Davis' subjective complaints that formed the basis of his 602. Casian Depo 27:5-17. But she said she interviewed Davis and obtained his history and the basis for the 602 medical appeal in person. Casian Depo 27:18-28:11.

In contrast to Dr. Casian's note of "intermittent pain," in his sworn declaration, Davis says that he reported to Dr. Casian throbbing pain that impacted his ability to work and sleep. Davis Decl. ¶ 14. He explained that seeing a podiatrist for debridement and wearing orthopedic shoes helped his condition, and that using an upper bunk caused him pain and discomfort. *Id.* Davis says that Dr. Casian responded, "you look healthy enough to climb," and noted that he did not have a chronic condition (in contrast to Dr. Wagers' assessment) and that other people needed lower bunks. *Id.*

Comparing Dr. Casian's treatment notes from November 19 with the medical requests and records that form the basis of the 602, as well as with Davis' sworn

declaration, Dr. Casian's note of only "intermittent foot pain with prolonged walking and standing" contradicts the statements of pain and trouble with daily activities that were documented before the November 19 appointment. The court finds this difference in the reporting and recording of Davis' pain and abilities to be a genuine issue of material fact as to whether Dr. Casian was deliberately indifferent to Davis' medical needs.

Dr. Casian further argues that her determination that there was no medical need to renew the lower bunk chrono and podiatrist referral is merely a difference of medical opinion from that of other doctors. With regard to medical treatment, a difference of opinion—even if it constitutes malpractice—does not amount to deliberate indifference to medical needs. *Estelle*, 429 U.S. at 106; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). The plaintiff must show that the chosen course of treatment was medically unacceptable under the circumstances, and that it was chosen in conscious disregard of an excessive risk to the plaintiff's health. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Here, Davis has gone beyond the pleadings to deposition testimony and medical records to show that there is a genuine issue of material fact as to whether Dr. Casian chose a course of treatment that was medically unacceptable under the circumstances. In deposition she admitted that she reviewed the medical records and knew of the chronic foot pain. She also said that she knew the basis of Davis' 602 complaint, which included worsening foot pain that went untreated for 13 months, difficulty accessing a top bunk, and that regular debridement and orthopedic shoes helped Davis' condition. But Dr. Casian ignored the prior diagnosis of chronic foot pain, the previous "permanent" medical chrono ordered by a podiatrist, and the documented complaint history when she relied on her single examination to deny the chrono renewal. There is a legitimate question of fact as to whether Dr. Casian's chosen course of treatment was unacceptable under the circumstances when there was a podiatrist readily available—visiting Donovan approximately once per week—to examine patients. Frieder Decl., Ex. D, Walker Depo 68:10-19.

Davis also raises a question of fact as to whether a decision to deny referral to a podiatrist was based on non-medical factors. As Dr. Campbell noted, at some point during Davis' incarceration Donovan "lost the contract" with podiatry and there was a "podiatry backlog." Frieder Decl. Ex. C, p.2. Further, Donovan was determined to have "systemic issues that present ongoing serious risk of harm to patients and result in preventable morbidity and mortality." Frieder Decl., Ex. F, pp.5-6.

Dr. Casian's denial to renew the chrono—or even to renew it temporarily pending a referral to podiatry—may have caused Davis further injury when his foot allegedly shot in pain as he tried to descend from the top bunk, injuring his back. Based on the questions of fact material to Dr. Casian's subjective knowledge and actions in this case, this court recommends that the district judge deny summary judgment as to Dr. Casian.

### 2. Dr. Walker

Davis alleges that Dr. Walker worked to void the medical chronos of the inmate population in general, and in particular worked to void Davis' chrono. Compl., p.13. Davis also alleges that Dr. Walker was deliberately indifferent to his medical needs regarding renewal of his lower bunk chrono and a referral to podiatry.

Dr. Walker argues that he is entitled to summary judgment because he never personally treated Davis and was not involved in his medical treatment. Walker Decl. ¶ 3. He argues that as to Davis, his only involvement with him was that he reviewed Davis' two inmate appeals. Walker Decl. ¶ 4; Ex. A. Finally, Dr. Walker argues that he did not set, enact or enforce a policy to arbitrarily deny or revoke medical chronos for any inmate, including Davis. Walker Decl. ¶ 5.

Dr. Walker is the Chief Surgeon and Physician at Donovan. Walker Decl., Ex. A. He also sat on the Institutional Utilization Management Committee (IUMC) when Dr. Campbell submitted a request for services (RFS) for Davis to see a podiatrist. Frieder Decl., Ex. D, Walker Depo 55:4-13. The IUMC "review and manage referrals for specialty medical services" and "review and manage institutional…bed usage." Frieder Decl., Ex. B, §3352(a). Thus, Dr. Walker was aware of the IUMC's prior approval of

Davis' "permanent" chrono for a lower bunk, as well as Dr. Campbell's requests for Davis to see a podiatrist. Therefore, Dr. Walker had actual knowledge of Davis' chronic foot pain and his previous accommodation.

Dr. Walker testified that in reviewing Davis' 602 form, he reviewed Davis' complaint, Dr. Casian's progress note, and nothing else. Walker Depo 38:10-39:7. But in response to the 602 form, Dr. Walker said he also reviewed the "electronic Unit Health Record" for Davis, which presumably would have included Davis' subjective complaints and treatment history. Walker Decl., Ex. A. Dr. Walker also knew that Davis complained the "treating" nurses failed to appreciate his condition. Walker Depo 37:1-15.

Just because Dr. Walker was presented with Davis' concerns during the appeals process as opposed to during a personal medical examination does not relieve him from potential eighth amendment liability. *See Keller v. Faecher*, 44 Fed.Appx. 828, 831-832 (9th Cir. 2002) (finding deliberate indifference claim against a doctor for denying an inmate appeal was not actionable only where the denial "did not constitute a denial, delay, or intentional interference with medical treatment"). Here, Davis points to deposition testimony, the first 602 grievance response, and medical records that indicate Dr. Walker's subjective knowledge of Davis' condition and the risk of harm Davis faced. Dr. Walker received further information when Davis drafted his second 602 on December 12, 2012, stating: "I had surgery on the step of my left foot, I'm always in pain with my step, my left foot will always be vulnerable due to that surgery….I am currently in pain and on the top bunk. Please review my podiatry records." Frieder Decl., Ex. A, p.16. Based on Dr. Walker's knowledge of Davis and his treatment history and diagnosis by a podiatrist, this court finds a question of material fact as to whether Dr. Walker intentionally interfered with Davis' medical treatment by denying him a podiatry referral and lower bunk chrono.

As explained for Dr. Casian, there is also a question of material fact as to whether the decision to deny referral to a podiatrist was based on non-medical factors. *See*

Frieder Decl., Ex. F, pp.5-6 ("Donovan Health Care Evaluation").

Finally, Dr. Walker's denial of the appeal that prevented Davis from seeing a podiatrist or getting a lower bunk chrono may have caused Davis further injury when his foot allegedly shot in pain as he tried to descend from the top bunk, injuring his back. Based on the questions of fact material to Dr. Walker's subjective knowledge and actions in this case, this court recommends that the district judge deny summary judgment as to Dr. Walker.

### 3. *Correctional Officer Flores*

Flores says that on December 10 an inmate with a valid medical chrono needed a lower bunk but none were available. Flores Decl. ¶ 4. So Flores asked Davis if he had a valid medical chrono. *Id.* Davis did not have a paper copy of the chrono, so Flores checked the computer. *Id.* Flores said that there was no valid medical chrono or other accommodation for Davis noted on the computer, so he moved Davis to an upper bunk. *Id.* In his declaration, Davis says that Flores actually saw Davis' permanent chrono on the computer, yet stripped him of the lower bunk anyway. Davis Decl. ¶ 15. But Davis' declaration belies what he pleaded in his medical evaluation requests and 602s, arguing that he needed his chrono renewed because it was not logged into the computer.

Specifically, on September 17, 2012, Davis filled out a Reasonable Modification or Accommodation Request, and asked that his chrono be placed in the computer for medical staff and officers because his chrono was not "logged in the computer." Frieder Decl., Ex. A, p.14.

By Davis' own admission, defendant Flores did not have subjective knowledge of a lower bunk chrono, so he could not have been deliberately indifferent to Davis' serious medical needs. The court, therefore, finds no question of fact material to Flores' subjective knowledge and actions in this case, and thus recommends that the district judge grant summary judgment as to defendant Flores.

///

///

### V. **Conclusion.**

For the foregoing reasons, this court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED in part** and **DENIED in part** as follows:

1. **DENY** as to Dr. Casian;
2. **DENY** as to Dr. Walker; and
3. **GRANT** as to Correctional Officer Flores.

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than **January 29, 2016**, any party to this action may file written objections and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections must be filed and served on all parties no later than **February 5, 2016**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: January 15, 2016

Hon. Nita L. Stormes
United States Magistrate Judge